**Exhibit ANS124**

CAUSE NO. 017-287611-16

| | | |
|---|---|---|
| GHRIST LAW FIRM, PLLC, AND IAN GHRIST | § § § | IN THE DISTRICT COURT |
| *Plaintiffs,* | § § | |
| VS. | § § | |
| J. MICHAEL FERGUSON, P.C.; J. MICHAEL FERGUSON; ANSON FINANCIAL, INC.; AND MBH REAL ESTATE, LLC | § § § § | 17th JUDICIAL DISTRICT |
| *Defendants/Counter-Claimants* | § § | TARRANT COUNTY, TEXAS |

---

**AFFIDAVIT OF IAN GHRIST #2**

---

STATE OF TEXAS        §

COUNTY OF DALLAS    §

BEFORE ME, the undersigned Notary Public, on this day personally appeared Ian Ghrist, the person whose name is subscribed hereto, and after being duly sworn under oath and subject to penalty of perjury deposed and stated as follows:

1.    "My name is Ian Ghrist. I am over the age of eighteen (18), of sound mind, and I am fully competent to make this affidavit. I have personal knowledge of the matters stated herein and they are true and correct.

2.    The word "Portfolio" or "MBH" or "MBH Portfolio" as used herein refers to all loans, properties, and anything of value recovered from or related to Cause Numbers 236-269254-13 and 236-248435-10 in the 236th Judicial District Court of Tarrant County, Texas and MBH Real Estate LLC. The word "Separation Agreement" refers to the agreement of the parties dated 12/04/2015.

3.      J. Michael Ferguson and I signed the written separation agreement dated
December 4th, 2015 with intent to wind down our various joint ventures. The written separation
agreement was not an arm's length contract as we had shared profits, worked jointly, shared
responsibilities, and jointly managed many projects, and acquired assets that we jointly owned
and controlled, like the mortgage note on 2504 FM 546, McKinney, TX 75069 and the MBH
Portfolio, thus, making the agreement much more than a mere arm's length contract. The
agreement merely memorialized our pre-existing operating agreement for the joint venture or
partnership and provided for a method for the venture to be wound down so that we could
separate our business dealings. The written agreement was in no way intended to change our pre-
existing operating agreement—only to memorialize it. If Ferguson intended to change the terms
of our pre-existing operating agreement to make the terms more favorable to himself in the
written separation agreement, then I certainly received no consideration for any change.

4.      After Ferguson and I separated, Ferguson failed to provide Coker or myself with
any control or access to information, except that Ferguson produced one report for February
2016 and one report for March 2016. All prior reports that Ferguson prepared, being the reports
provided on June 1st, 2015 and November 24th, 2015, showed the interests in the Portfolio as
"Ghrist: 13.332%, JMF (J. Michael Ferguson): 26.668%; NPI (Coker's entity): 60%." It was
only after Ferguson and I separated that Ferguson changed the reports to delete my ownership
percentage and change Ferguson's ownership percentage from 26.668% to 50%, thus, stealing
both my percentage and a portion of Shawn Coker's percentage. Ferguson's actions in changing
the ownership percentages without Ghrist's consent demonstrated intent to commit conversion of
Ghrist's previously-acknowledged "13.33% stake." Ferguson subsequently did convert Ghrist's
interest in the Portfolio and cash from the Starr and Baker matters by unlawfully and without

authorization assuming and exercising control over the property to the exclusion of and inconsistent with Ghrist's and Coker's interests. Namely, Ferguson collected payoffs on the Starr and Baker accounts, without disclosing the payoffs to Ghrist or paying Ghrist's share to Ghrist. Coker, with Ghrist's assent, demanded return of the property by transferring it to a neutral, third-party loan servicing company. Ghrist gave Coker Ghrist's permission and authority to make the demand for transfer of the property on Ghrist's behalf as Ghrist's agent. Ferguson wrongfully refused. I also discussed the MBH Portfolio with Ferguson many times and he always acknowledged that I owned 1/3 of any property or money that he acquired based on our longstanding agreement and course of dealing on our various joint ventures, including other contingency fee cases, like the Reynolds case and the Reynolds note. The Reynolds note, owned jointly by Ferguson and Ghrist, was another product of contingency fee litigation that resulted in the recovery of a note instead of cash. Ferguson serviced the loans and handled all of the day-to-day operations and had all of the access to all of the information regarding the portfolio. Any information that Coker or myself acquired was through Ferguson. Ferguson had sole control at this point of all properties and information. Coker and I were wholly dependent on him to receive payment or information. The Starr, Reynolds, and Baker matters covered by Brandon Lim's reports were all examples of non-MBH contingency fee work course of dealing for the Ghrist-Ferguson joint ventures. In Starr, we recovered a promissory note on real property owned by our client. In Baker, we acquired a payment stream as a settlement, and on Reynolds, we acquired a note. My interest in the note on Reynolds went into Gasget, LLC, a company that I own.

5.      Shawn Coker demanded that Ferguson move control of the Portfolio to a third-party loan servicing company on June 3rd, 2016 by email. Mr. Coker consulted with me and I agreed that control should be moved to a neutral third-party who lacked the conflicts of interest and inability to provide regular payments and financial information. Mr. Coker advised Mr. Ferguson that I would be in agreement with the move of control. Mr. Ferguson's response was to adamantly refuse to give up control and threaten, insult, and try to intimidate. The response was extremely unprofessional, rude, obnoxious, and laced with profanity. The emotionally-charged, diatribe of response in the email dated 06/04/2016 was completely uncalled-for under the circumstances.

6.      The partners or joint venturers clearly shared profits—1/3 of net incomes to Ghrist Law Firm and 2/3 to J. Michael Ferguson PC ("Ferguson PC"). Ferguson PC received payment of more than fifty-percent of the net incomes because Ferguson PC paid most of the expenses and, generally, reimbursed Ghrist Law Firm when Ghrist Law Firm paid case expenses like mediation fees, court reporter fees, or other miscellaneous expenses. Also, Ferguson PC brought Ghrist Law Firm most of the cases that Ghrist worked on, but Ghrist Law Firm provided most of the legal work on the cases. Ferguson contributed occasionally to some cases and occasionally billed his time to the cases, but Ghrist mostly handled that. Ferguson provided Ghrist with no training and Ferguson knew little to nothing about litigation, despite whatever expertise he alleges to have regarding closing real estate transactions. Ferguson and Ghrist also shared liabilities. For example, Ghrist Law Firm assumed liability for a long-term contract with a legal research service provider for Ghrist Law Firm.

7.      Regarding expression of intent to be partners in the joint ventures, the fact that Ghrist set up a separate legal entity, Ghrist Law Firm PLLC, to conduct business under and that Ferguson helped Ghrist with start-up costs for the entity and voluntarily participated in promoting Ghrist's legal services so that Ferguson could obtain a percentage of the legal fees that Ghrist generated is a clear indicator that both parties intended to be partners or joint ventures in the cases or matters that they took on. While Ghrist was an employee of Anson Financial, Inc., an entity owned by Ferguson, Ghrist was not an employee of J. Michael Ferguson, P.C., never received any payroll from J. Michael Ferguson, P.C., and conducted business either as an agent (of counsel-type) for Ferguson PC or under Ghrist Law Firm PLLC. Regardless of which method was used in litigation, the payment arrangements were the same for every case that Ferguson and Ghrist jointly handled—namely, Ghrist received 1/3 of net incomes, Ferguson received 2/3 of net incomes, and Ferguson paid or reimbursed expenses in advance (to be reimbursed by the clients later) in exchange for his larger percentage of the profits. If Ferguson had intended for Ghrist to be merely an employee or independent contractor for Ferguson PC, then the parties would not have shared office space and supplies, taken on joint projects, shared control over those projects, shared incomes from the projects, solicited business for each other, avoided taking on litigation projects on their own without the involvement of the other person, or offered joint representation agreements to the litigation clients. The intent to partner on the litigation projects was clear by the shared profits and shared control of those ventures. Both parties expressed this intent through their actions as described above.

8.      The parties shared control of the partnership or joint ventures on various legal projects until they separated. Ghrist generally controlled the receivership, the litigation (being listed as lead counsel or attorney of record on most of the matters to be litigated), and the client

relationships. Ferguson would generate new business, and then hand the clients off to Ghrist to handle after litigation started. Ferguson generally handled the accounting, transactional work (often with help from Ghrist), new business generation, loan servicing, and other matters. But, there were occasions where Ferguson helped with litigation or where Ghrist helped Jessica Dorsett and Ferguson work on their Quickbooks files to fix the many bookkeeping problems and errors that arose. There was shared control of the files with various spheres of influence, but generally joint decision-making regarding major decisions like whether or not to advise a client to settle and for what to settle and how to structure settlements and payments to the joint venturing parties, Ghrist Law Firm PLLC and J. Michael Ferguson P.C. Both Ghrist and Ferguson exercised substantial control over each venture.

9.      Because the litigation projects rarely involved substantial expenses that the clients did not reimburse, except for some limited expenses (generally under $1,000.00) on contingent-fee cases, there were not substantial losses to incur. Ghrist assumed liability for the legal research service account with LexisNexis. Ferguson assumed liability for the e-Filing account. Ghrist paid some expenses, like the mediation fee for the Dieffienwierth mediation. Ferguson reimbursed these expenses when Ghrist remembered to invoice them, but usually reimbursed them several months late or after the litigation had concluded so that the reimbursement actually came from the client and not from Ferguson. Ferguson, through Anson Financial, Inc., paid for the office space that the parties used and various other expenses, including expenses like the $5,000.00 MBH receivership bond, but in exchange for paying expenses, received twice the net incomes that Ghrist received.

10.      Ghrist Law Firm paid court reporters, mediators, and other miscellaneous third-parties when necessary to further the litigation business. Ferguson PC reimbursed these amounts,

but usually reimbursed those amounts several months late or only after the lawsuits had settled and paid or the clients had reimbursed Ferguson PC for the expenses. Ferguson PC contributed the office space, most of the office supplies, and furniture, but the office space and furniture really belonged to Anson Financial, Inc., which was the main tenant in the building. Ferguson operated Anson Financial, Inc. and J. Michael Ferguson P.C. as alter egos of each other, moving money and property from one to the other or allowing one entity to use the other entity's resources whenever convenient. Ghrist Law Firm purchased some office supplies, particularly binders, tabs, and stickers for litigation purposes, but also various other office supplies. Ghrist Law Firm assumed liability for the legal research service and paid for it monthly, but Ferguson reimbursed Ghrist for this expense (again, the reimbursements were erratic and frequently late by several months, but Ferguson did get them caught up shortly before Ghrist left). Ghrist offered to contribute 1/2 of the expenses on the Plantation Street project in exchange for a 1/2 share of the net incomes instead of just the 1/3 share, but Ferguson refused, which was fine because the prior operating agreement of the parties, demonstrated by their course of dealings, was that Ferguson would pay or reimburse expenses in exchange for twice the net incomes that Ghrist received, despite Ghrist performing most of the work. Ferguson never disclosed to Ghrist whether he would remodel the Plantation Rd. project or sell it for cash. Ferguson remained silent in the face of a duty to speak about the Plantation Rd. project when he said nothing about the project until he failed to make payments on the MBH Portfolio, and only then mentioned that he had been remodeling the Plantation Rd. project using Ghrist's money from the MBH Portfolio without discussing the matter with Ghrist. Ghrist never agreed to pay expenses on the Plantation Rd. project and the course of dealing of the parties was always that Ferguson paid expenses upfront in exchange for more than 50% of the net incomes. The Plantation Rd. project could easily have

been sold for cash "as is" for $40,000.00 to $50,000.00, which would have netted $28,000.00 to $38,000.00 because the project was purchased for $12,000.00 from the Douglas heirs. Ferguson alleges that he spent over $70,000.00 on the project only to owner-finance the property on a $75,000.00 note—this makes no sense as the property could have simply been sold through a realtor instead of owner-financed. Owner-finance generally only makes sense for buyers that are willing to put their own sweat equity into the house. Regardless, if Ferguson wanted to remodel the property, without consulting Ghrist, then he was welcome to do so with his own money at his own expense, but Ghrist never agreed, either in prior course of dealings or in the written agreement, to reimburse Ferguson's costs (which is the main reason why Ferguson was paid 2/3 of the net incomes instead of 50%), especially when Ghrist was not consulted regarding any decisions to spent any funds and the funds appear to have been spent on extremely poor remodeling and sales decisions that caused severe damage to the parties' interests, and are highly suspicious given how easy it would have been for the Plantation Rd. project to be profitable for both parties instead of being as unrewarding as the Defendants allege it to be. It seems like the Defendants are making the Plantation Rd. project look much less profitable than it actually was in order to use it as some excuse for nonpayment on the MBH Portfolio because the numbers and decision-making on the Plantation Rd. project that are being reported by the Defendants do not make sense.

11. Ferguson had all of the control of the properties and finances after Ghrist and Ferguson separated, except for a tiny amount of money in the receivership account, which was less than 1% of the value of the MBH Portfolio. Ferguson used his control of the information and day-to-day operations to try to convince me that the Portfolio was far less profitable or valuable than it actually was. He withheld information from me, for example, when I asked to see the

"Exhibit A" wherein Ferguson claimed $60,790.95 in expenses, he ignored my request, and instead, insulted and threatened me with frivolous litigation and unfounded accusations. Couple that with Ferguson's threats to "get involved in" Shawn Coker's "other business relationships" and the fact that in response to this lawsuit, Ferguson filed frivolous cross-claims against my friends, Derek Hausheer and Ashleigh Renfro, Ferguson's bad faith and malicious intent is abundantly clear. Based upon my review of the financial documents produced in this litigation, and my knowledge of the finances from before Ferguson and I separated, Ferguson's reports that I relied upon in signing the written separation agreement and in considering his buy-out offer were false and inaccurate as they made the Portfolio look less profitable and valuable than it actually was. In the discovery phase of this lawsuit, Ferguson frequently produced reports that arbitrarily deleted loans from the Portfolio, inflated expenses, and underreported incomes. These reports were meant to mislead myself and my Certified Public Accountant expert witnesses as to the true value and profitability of the Portfolio.

12.     Regarding breach of fiduciary duty, based on our relationship, I placed trust and confidence in J. Michael Ferguson, J. Michael Ferguson, P.C., and Anson Financial, Inc. ("Anson") to act in my best interest regarding the loans that Anson serviced for me and the finances that Ferguson et. al. managed that I had a stake in. This was a relationship of trust and confidence. I lost confidence only after Ferguson and I separated and Ferguson started threatening Coker, withholding information, and emailing profanity-laced excoriations to Coker and to myself when we asked simple questions about the status of the Portfolio and Ferguson's lack of payment to us. The transactions in question were not fair and equitable to me as information was withheld, my funds were withheld, and I lost control of the assets. J. Michael Ferguson did not make reasonable use of the confidence that I placed in him as he answered

simple questions with profanity-laced diatribes, failed to pay me, and threatened to sue and did sue my friends for frivolous reasons, all with intent to buy me out for a fraction of what my interests were worth. J. Michael Ferguson did not act in the utmost good faith or exercise the most scrupulous honesty towards me because he withheld information, acted unprofessionally, insulted and threatened me, and failed to pay the amounts owed as they came due. J. Michael Ferguson clearly did not place my own interests before his own as every action that he took after we separated was clearly intended to force Shawn Coker and myself to sell out to him for pennies on the dollar so that he could unjustly enrich himself even more than he had already been enriched. J. Michael Ferguson used the advantage of his position to gain as much benefit for himself as possible at the expense of Shawn Coker and myself by wrongfully claiming ownership of all of my interests and 10% of Shawn Coker's 60%, but providing incorrect and false financial reports that made the Portfolio look less profitable or valuable than it actually was, and by wrongfully refusing to allow a neutral, professional third-party loan servicing company to take over his job so that he could continue to charge self-dealing loan servicing fees, take the borrower's late-payment fees for himself, and bill legal fees to the Portfolio and pay himself out of Coker's and my own funds. J. Michael Ferguson did not fully and fairly disclose all important information to Shawn Coker or to myself as he withheld documents that I requested and provided reports that, upon audit by a Certified Public Accountant, and based upon my own knowledge and review, turned out to be false and incorrect.

13. I performed my end of the bargain by taking the MBH file and reviewing it, creating a plan of action, subpoenaing witnesses for depositions, finding out where David Boles' bank records were from those witnesses, subpoenaing the bank records through financial records requests, reviewing voluminous information there, attending a debt collection conference and

learning about receiverships, putting David Boles and his entities into receivership, filing for writs of execution, working with Khayan Williams at the Tarrant County District Attorney's office on converting the writs into a motion for turnover order relief, drafting, researching, and filing for and obtaining turnover relief through a turnover order in Cause No. 236-269254-13 in the 236th District Court of Tarrant County, Texas dated Feb. 20th, 2015, and by litigating against Teisha Boles and ultimately compelling her to turnover all of the control and access to the files for the notes and deeds of trust in the MBH Portfolio, which lead to the beginning of Anson Financial, Inc.'s loan servicing and collections. I also litigated the case against Jim Dieffienwierth to a mediation that I attended with Shawn Coker and obtained several additional properties there. I also handled the receivership as the receiver. I checked the mail box for MBH, handled paperwork, dealt with any issues that arose. Ultimately, I performed many hundreds of hours of work. My work resulted in the recovery of the MBH Portfolio. Without my work, the MBH file would still be sitting in a drawer untouched. Mr. Ferguson did not know what a receivership was or how to implement one. He told me on numerous occasions that he thought that the judgment against Boles had no value, that I would never get Boles's bank information, that I would never get Teisha Boles to turn over the notes, and that he had no idea whether we could recover anything against Dieffienwierth. At the time that I took over the file, Ferguson was engaged in pointless and fruitless appellate litigation with Teisha Boles that resulted in nothing. My work, on the other hand, resulted in the recovery of all of the assets that Ferguson now controls. My work enriched Ferguson by over seven hundred thousand dollars both in the value that he obtained from his 26.66% interest and from the additional interest that he acquired from Coker by buying Coker out for a huge discount to the actual value of the notes in the Portfolio. Accordingly, I performed my end of the bargain. In return for all of my efforts, I was insulted,

threatened, sent profanity-laced emails, and paid absolutely nothing for my 13.33% acknowledged stake. If Ferguson or Coker would have hired another law firm to perform all of the work that I performed, then based on my knowledge of the work performed, the expertise necessary, the reasonable rates of attorneys in the area, and the time and effort necessitated by the recovery efforts, Ferguson and Coker would have spent $150,000.00 in attorney's fees. Accordingly, in the unlikely event that I fail to prevail on any other claims, I should be awarded $150,000.00 in *quantum meruit* for the work that I performed with the expectation of compensation.

14.    Regarding damages, I spent extensive time reviewing the documents and information produced by Ferguson in the discovery process in this suit and I combined this information with my own personal knowledge acquired from before Ferguson and I split up. Based on the foregoing, as of August 31st, 2017, the MBH Portfolio generated $608,930.42 in net incomes that are available for distribution to Ferguson, Coker, and myself. Accordingly, I was owed $81,170.42 as of August 31st, 2017 on the MBH Portfolio. I can try to update this figure through the trial date based on new information acquired before trial from Ferguson. I am further owed $8,615.92 on the Starr matter, $3,033.03 on the Baker matter, $6,371.23 in mineral income from MBH Portfolio property, and $1,307.43 in Plantation Rd. incomes. I agreed to reimburse Ferguson for $1,821.42 in miscellaneous expense mostly related to the start-up of Ghrist Law Firm, bringing the amount of cash owed today to a total of $68,881.67. I would further assert that 13.33% of the remaining face value of the MBH Portfolio notes, the Reynolds note, the Plantation Rd. equity, and the remaining mineral rights value is $126,482.41. I would ask that the Court impose a constructive trust, wind up the partnership or joint venture, appoint a receiver over the MBH Portfolio, or perform a judicial partition of all MBH Portfolio property and that

the trustee, judicial wind-up appointee, receiver, or partitioning commissioner transfer property with a total value of $126,482.41 to Ghrist Law Firm PLLC or to myself or assigns. The MBH Portfolio property is amenable to a partition in kind because 13.33% of the notes can simply be transferred to the Plaintiffs.

15.     Finding a professional, neutral, third-party loan servicing company is extremely easy. Finding one that has more experience or expertise than Ferguson in dealing with problem or distressed assets is also extremely easy. For example, August REI is a great local company based on Dallas, Texas that could be used. Then, there is Evergreen Note Servicing, a larger multi-state company. Both would have been easy to hire and great and professional options to service the loans. Ferguson's argument that no one can service the loans except him is completely ridiculous. Servicing loans is very easy. It consists merely of invoicing the borrowers, collecting the payments, and correctly accounting for the escrow and other funds, along with making sure that the taxes and insurance get paid and handled correctly. Ferguson has struggled to perform all of these duties. On the Reynolds note, for example, he allowed the borrowers to become over a year delinquent on their escrow obligations. He caused similar problems on the MBH Portfolio notes, caused title problems on 4228 Ave. N.,[1] and he claims that he barely broke even on the Plantation Rd. project even though that property was acquired for a small fraction of its "as is" value and could have been easily sold for cash for at least $30,000.00 profit. Due to the foregoing, Ferguson appears to be incapable of managing the notes and properties. His bookkeeping is also rife with problems leading to the incorrect reports, failure to provide tax statements necessary for the IRS, problems with the borrowers' escrow, *etcetera*. The reason that he cannot provide bank reconciled, double-entry bookkeeping is that

[1] See Ghrist Aff., Ex. A for more detail.

Anson Financial, Inc.'s and J. Michael Ferguson, P.C.'s and Ferguson's own finances are so behind on proper bookkeeping that he uses them interchangeably and cannot keep them all straight or reconciled, let alone try to reconcile the books for the MBH Portfolio, which is why I had to hire a third-party accountant with expertise in owner-finance notes to come in redo the books in connection with this lawsuit.

16.     I was okay with Shawn Coker and J. Michael Ferguson being managing members of MBH Real Estate LLC initially, but only because I would still be a regular member with some authority to protect my interests and because Coker's 50% would prevent Ferguson from having total control and Coker seemed very reasonable. Ferguson, on the other hand, was becoming strangely paranoid. Shortly before we separated, Ferguson started making weird comments about how he thought that Coker would try to rip us both off and that I needed to side with him over Coker if I wanted to get paid anything. I got no impression from Coker whatsoever that Coker was trying to not pay the contingency fee or anything like that, so I did not understand why Ferguson was so paranoid. When Ferguson send the email dated July 1st, 2015 about creation of MBH Real Estate LLC, I talked to him about it and he assured me that he would draft an operating agreement for the new entity that would include and protect all three of our interests— mine, Coker's, and his (just like the trust that MBH Real Estate LLC replaced), and would have language that would protect all three of our interests. When Ferguson listed himself and Coker as managing members, there was never any discussion about me not being a regular member or not having any authority as an officer of the entity. I was told by Ferguson that I would be a member in the operating agreement for the new entity, that nothing would change regarding my ownership interest or control, and that my 13.33% interest would be protected by the operating agreement language that Ferguson would draft for my review and for Coker's review. At the

time, I had no reason to believe that my interest would not be included on the operating agreement because my interest was listed on the financial reports that Ferguson was creating, was on the trust, and was often acknowledged verbally by Ferguson and Coker. It was agreed that my interest would be put into the written operating agreement that Ferguson was supposed to draft and never got around to drafting. J. Michael Ferguson paid Shawn Coker $525,493.08 and drafted documents that Ferguson now alleges could convey the entire Portfolio including my 13.33% stake in the Portfolio to J. Michael Ferguson or his entities, but I never agreed to that. I was wholly and wrongfully excluded from all settlement negotiations. Ferguson was deliberately silent in the face of a duty to speak, in that, he failed to tell me, when I questioned him, that he intended to allege that I had no ownership interest in MBH Real Estate LLC even though our agreement all along was that I would have a 13.33% interest and he would have a 26.66% interest. I did not agree that Ferguson could increase his *pro rata* share by buying out Coker without myself having the opportunity to participate in the buy out to keep my proportionate share. If I had known that Ferguson's financial reports were inaccurate, that I was owed much more money than shown on the reports or disclosed by Ferguson even after deduction of expenses, that Ferguson intended to allege that I had no ownership of MBH Real Estate LLC, that Ferguson would buy out Coker without giving me an opportunity to participate in the buy out, that by signing the written separation agreement and leaving Ferguson's offices that Ferguson would take total control of the MBH Portfolio and use that control to attempt to threaten and intimidate Coker and I into taking extremely low buy out offers, then I would not have signed the written separation agreement as it was drafted, would not have allowed Ferguson to continue to service the notes, as receiver and as Shawn Coker's other attorney would have fired Anson Financial, Inc., would have insisted on the completion of the MBH Real Estate LLC

operating agreement before signing the separation agreement, would not have allowed Ferguson to obtain control of the properties, would not have allowed the properties to pass to MBH Real Estate LLC, and would not have refrained from or delayed collections efforts on the sums owed to me.

17.     I did not agree and would adamantly oppose Shawn Coker being removed as a managing member without myself being replaced as a managing member or at least as an officer with authority to protect my interests because, under no circumstances, would I have agreed to Ferguson having total control of the MBH Portfolio. On June 3rd, 2016, Shawn Coker advised Ferguson by email that he would contact me regarding transferring servicing. He did, and I agreed to join in the demand of the transfer of servicing. Shawn Coker and I had previously discussed transferring servicing and I agreed that it needed to be done and agreed that he would make the demand for both of us. On June 7th, 2016, Shawn Coker emailed Ferguson to advise him that he was making a settlement proposal on my behalf that would resolve my interest in the Portfolio. Ferguson's response was "You need to leave Ian out of this...." He then proceeded to state that my interest in the Portfolio no longer existed (why he said this, I still don't know or understand). Then, he threatened to "get involved in" his own client's "other business relationships." Shawn Coker was still my client, as he was also Mike Ferguson's client, and both Mike Ferguson and myself owed fiduciary duties to Shawn Coker to put Shawn Coker's interests ahead of our own. On June 7th, 2016, Ferguson emailed Coker to say that "If you email me anything with Ian included in it, it will be ignored." On June 4th, 2016, Ferguson emailed Coker to say that "If you want to partner with my fired employees and get a lawsuit going, I will certainly oblige you Shawn." Both Shawn and myself tried to help Ferguson complete a transaction that would resolve my interest in the Portfolio and prevent this lawsuit, but Ferguson

did everything he could, including threatening wrongful actions, to avoid resolving all of the interests in the Portfolio in the transaction with Coker.

18.     I discussed the situation with Shawn Coker who was still a client of both myself and Ferguson. Coker believed, based on Ferguson's comments, that any further involvement of Ghrist in any settlement negotiations would damage Coker's chances of resolving the problem without litigation. Coker wanted to avoid litigation if possible, despite Ferguson having no grounds whatsoever for his positions or demands. Because I had a duty to put Coker's interests ahead of my own, I allowed Coker and Ferguson to negotiate between themselves, but I never consented to any agreements that they made. Neither of them asked me to agree to anything, they both knew that I needed to be involved, and so my rights and interests were wholly unaffected by any arrangement between the two of them. Accordingly, because Ferguson refused to offer me the chance to participate in the buyout, I was damaged by the loss of my proportionate share of the $300,448.20 in enrichment that Ferguson obtained by the buy out of Coker. My share was 1/3 of Ferguson's share, which makes my damages $57,407.45 on that matter. The course of dealing and agreement between Ferguson and myself was that I would receive 1/3 of money or property recovered from matters that I worked on and that Ferguson would pay the expenses upfront to be reimbursed out of future incomes in exchange for double the net recovery that I received. It obviously would have been more advantageous to Ferguson to allow me to participate in the negotiations when he purchased Coker's interest, but his opposition to this was a voluntary choice that he made and he has to live with the consequences of it. He was afforded by Coker and myself every opportunity to reach a final resolution and voluntarily chose not to do so.

19.     I reviewed the same materials that Brandon Lim reviewed, and I have some personal knowledge from before Ferguson and I separated, and I concur that as of July 31st, 2017, the amount of cash income net of expenses and available for distribution from the MBH Portfolio was $395,220.62, and 13.33% of that amount would be $52,682.91. As of September 20th, 2016, the amount of cash income net of expenses and available for distribution from the MBH Portfolio was $324,210.57, and 13.33% of that amount would be $43,217.27. As of February 1st, 2016, the amount of cash income net of expenses and available for distribution from the MBH Portfolio was $278,092.60, and 13.33% of that amount would be $37,069.74. As of June 30th, 2015, the amount of cash income net of expenses and available for distribution from the MBH Portfolio was $185,926.35, and 13.33% of that amount would be $24,783.98. As of July 31st, 2017, J. Michael Ferguson or Anson Financial, Inc. dba AFI had charged and paid $22,999.30 in fees to the MBH Portfolio for closing fees, legal fees, management fees, and other fees. J. Michael Ferguson or Anson Financial, Inc. also charged the borrowers, on the Notesmith reports, an additional $4,260.05 in various fees as of August 31st, 2017. In addition, J. Michael Ferguson or Anson Financial, Inc. kept the borrower's late-payment fees, which as of August 31st, 2017 added up to $10,447.35. In addition, I think Ferguson is also paying himself a 1.00% loan management fee based on the face value of the notes, but I have not been able to figure out where this is invoiced or itemized. Both Coker and I have offered to service the loans and provide professional accounting free of charge, and so all of these self-dealing fees are unnecessary and unwarranted. Ferguson has been paid more than enough money to provide professional and accurate, bank-account reconciled, double-journal entry bookkeeping financial reports, yet has failed to deliver such reports, instead producing only self-serving summaries that do not add up correctly. Ferguson's payment of all self-dealing fees to himself out of other

people's money should be denied. Accordingly, Ferguson is not doing his job with the money that he is paying himself. He is paying these fees to himself with my own money. Since we separated, he never consults with me regarding these fees or any decisions regarding the Portfolio. Furthermore, as of July 31st, 2017, the face value of the notes and value of mineral rights to me is $126,482.41. On that date, I was owed $68,881.67, not counting the self-dealing fees. The total amount that I am claiming is $195,364.08, not counting self-dealing fees. I would like for the Court to partition the $126,482.41 interest, convey it via a constructive trust, or divide it in a court-ordered wind-up of the affairs of Ferguson and his entities and myself and my entities. Based upon my review, the financial reports that Ferguson provided appear to be false and incorrect as the expenses are wrong and the incomes are also wrong in those reports. Ferguson has been enriched by $482,240.56, including the 26.66% interest he had worth $310,018.22 and the additional $172,222.34 in value that he received from the Coker buy out, plus all the self-dealing fees that he and the other Defendants charge that all are ultimately paid to Ferguson.

20. Ferguson PC and Ghrist Law Firm PLLC began joint venturing on litigation projects as early as November of 2013. The parties had a verbal agreement, evidenced by their course of dealing over two years of monthly invoices and payments pursuant to such agreement, that Ghrist would receive 1/3 of money or property recovered from matters that Ghrist worked on and that Ferguson would pay the expenses upfront to be reimbursed out of future incomes in exchange for double the net recovery that Ghrist received. At the end of each month, Ghrist would create an invoice to Ferguson showing net incomes that needed to have 1/3 payments made on or expenses that Ghrist paid that needed to be reimbursed out of Ferguson's funds or the client's funds. Ferguson was supposed to pay those invoices monthly, but he was behind on his

monthly payments for nearly the entire time that Ghrist worked with him. One invoice, he even took a full six months to get current on. He did eventually get the payments caught up, except for the MBH Portfolio payments and payments related to the written separation agreement or the Global oil and gas agreement. Ghrist never agreed that Ferguson had to approve clients in advance, and in fact, Ghrist and Ferguson had clients that Ferguson never met, and knew nothing about their case, and Ferguson was more than happy to take their money anyways. Claudia Johnston and Heidi Her are two examples of clients that Ferguson never met, but took 2/3 of their money without complaint.

21.     My agreement for 1/3 of net incomes or properties acquired by my efforts was with J. Michael Ferguson, personally and individually. Regardless of any written agreement with J. Michael Ferguson, P.C., my agreements have always been with J. Michael Ferguson, regardless of what entity he uses. He uses Anson Financial, Inc., J. Michael Ferguson, P.C., and various other entities interchangeably, but all the incomes go to him and are in his possession.

22.     This whole dispute has become extremely convoluted due to the time that we both allowed to pass, due to nature of the assets recovered and due to the fact that there have been numerous transfers by Mr. Ferguson of the assets that were originally acquired as payment for legal fees in the litigation.  However, it should be pointed out that Mr. Ferguson and I agree on the origin of this dispute.  I agree with the first two sentences of Section 4, Exhibit A, of Mr. Ferguson's affidavit.  Specifically, when this started, we did agree that Ferguson would cover litigation expenses and we would split the legal fees earned from our jointly represented clients with 66.67% going to Ferguson and 33.33% going to me of the net recovery from those cases.  It turned out that the legal fees earned in some of the cases were not collected in the form of cash, but in real estate notes or properties that generated cash over time.  The Teena Reynolds case is

one example. In that case, as can be seen from Exhibit K, an interest in the note equal to 1/3 of the contingency fee percentage (in that case 11.5%) was assigned to Gasget, LLC (a company that Ghrist Law Firm wholly owns) and an interest equal to 2/3 of the contingency fee percentage was assigned to Ferguson P.C. Under our course of dealing and agreement, I would receive a 1/3 percentage of legal fees recovered regardless of whether the recovery was in cash, promissory notes, real estate, contractual rights, or anything else. For example, as shown on Ex. N, Anson Financial paid me $71.67 per month on the Baker case and $112.13 per month due to my interest in the Teena Reynolds note. In Cause Nos. 236-269254-13 and 236-248435-10, primarily through my discovery efforts, we obtained more than a million dollars in notes payable over time. Accordingly, as legal fees on a contingency fee agreement, Mr. Ferguson acquired 2/3 of the contingency fee, being 26.66%, and I acquired 1/3, being 13.33%. Because Mr. Ferguson and myself acquired these interests jointly, Mr. Ferguson could not acquire more interests or different interests than the interests that I acquired. Mr. Ferguson has had sole control of those assets, the revenue streams and has re-titled some of the notes, has formed a company called MBH Real Estate, LLC, has conducted business under that entity, has paid himself tens of thousands of dollars from that entity for personal services that he claims to have rendered. None of that changes the fact that everything MBH, Mr. Ferguson or myself acquired originated from legal fees owed to us for work done in Cause Nos. 236-269254-13 and 236-248435-10, and that Ferguson's interests and my interests were joint interests so that Ferguson could not acquire property as legal fees without me also acquiring a percentage of that property. The accountant that I hired has worked through, as best he can, all of the money, property or value that was obtained from Cause Nos. 236-269254-13 and 236-248435-10 that Mike has solely controlled since January of 2016 and determined the total value collected in the form of notes, cash, and

real estate from Cause Nos. 236-269254-13 and 236-248435-10. My 33.33% of the legal fees recovery is $195,364.08 (which is 13.33 % of the total money collected/value from Cause Nos. 236-269254-13 and 236-248435-10 as stated in the Separation Agreement and 33% of the other non-MBH legal matters). I have not received that money, I have demanded it and I am owed it, but it was not paid. This suit was filed to get what I am owed. Mr. Ferguson is withholding the money that I earned from me, while at the same time he is using his money and my money to grow his business. There are various legal theories that can accomplish that goal, which I have pled, but stated generally, that's why we are here.

23. Further affiant sayeth naught."

Ian Ghrist

This instrument was acknowledged before me on this the 28th day of September, 2017 by Ian Ghrist.

Notary Public



CHRISTINA GUERRA
Notary Public, State of Texas
Comm. Expires 09-06-2021
Notary ID 131270603

Page 22 of 22